UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| Chelsea J. Kline, | : | Case No. 1:08CV2284 |
| Plaintiff | : | Judge Patricia A. Gaughan |
| v. | : | Magistrate Judge David S. Perelman |
| Commissioner of Social Security, | : | **REPORT AND RECOMMENDED DECISION** |
| Defendant | : | |

This action pursuant to 42 U.S.C. §§405(g) and 1383(c)(3) seeking judicial review of defendant's final determination denying plaintiff's claims for disability benefits, (DIB), 42 U.S.C. §§416, 423 and supplemental security income benefits (SSI), 42 U.S.C. §1381 et seq., is pending decision upon the parties' submissions on the merits, pursuant to which plaintiff seeks entry of final judgment in his/her favor, alternatively, an order of remand, and defendant seeks final judgment upholding the decision below.

The plaintiff's DIB application was filed on November 28, 2003, and alleged an onset date of disability of August 4, 2003. The SSI application was filed on October 18, 1004, alleging the same onset date.[1] In a Disability Report - Adult filed along with the DIB application the questions "What are the illnesses or conditions that limit your ability to work?" and "How do your illnesses, injuries or conditions limit your ability to work?" were answered "multiple sclerosis and

---

[1] In his decision the Administrative Law Judge erroneously states that the claims were filed on August 5, 2004 and November 9, 2004. It is clear from the face of the applications that the DIB application was filed on November 28, 2003, see R.77, and that the SSI claim was assigned a protective filing date of October 18, 2004, see R. 380.

fibromyalgia" and "pain in joints and muscles, dizziness, blurred vision, leg giving out."

Upon denial of the DIB claim at the state agency level the plaintiff requested de novo review by an Administrative Law Judge (ALJ).  When the SSI claim was denied at the state agency level it was escalated to the ALJ level for adjudication along with the DIB claim.

An evidentiary hearing was convened on August 7, 2007 via teleconference, with the ALJ, a medical expert, Dr. Jonathan Nusbaum, and a vocational expert, Mr. Barry Brown, in Columbus and the plaintiff and her counsel in Mansfield.

When asked by the ALJ to "tell me what medical problems do you have that you believe prevent you from working at all" the plaintiff responded "MS and fibromyalgia."  She then estimated her ability to stand before she had to sit or lie down at about a half hour, her ability to walk at probably two blocks and her capability to lift and carry at about ten pounds.  When the subject turned to her pain level, on a one to ten scale, the plaintiff stated that at that moment it was "probably a 4," but later testified that it varied and at least once a day reached the level of eight.  She was then asked where on her body she experienced the pain, and testified:

> A. Hip, legs, arms, back, neck.
>
> Q. Is there any particular area that's worse than it, than the other areas?
>
> A. Probably the hips.
>
> Q. Now, if you're in that normal area, that 4 range, are there any particular activities that you're aware of that you know if you do that activity, it's going to bump that pain up into that higher level?
>
> A. Anything.
>
> Q. I need you to be more specific than that.

>   A. Moving, if I go walking. Basically, anything, any kind of movement will agitate it.
>
>   Q. You're mentioned that—you mentioned earlier that you're taking Tylenol, have you ever tried any other pain medications?
>
>   A. Yes.
>
>   Q. What types of medications have you tried?
>
>   A. I can't remember the names of them, but there was several. One was Nortriptoline. There was a couple others, that he tried, but my system is so sensitive that I, I, I was like so dopey and so sleepy that I couldn't even function.[2]
>
>   Q. But when you experienced that severe pain, how do you deal with it?
>
>   A. I lay down, move around a little bit, mostly lay down.
>
>   Q. In a typical day, let's talk about during the day time hours, maybe between from when you wake up until about dinner time, how much time do you spend lying down?
>
>   A. Probably at least 5 hours, if not more.
>
>   Q. You mentioned earlier that 2 to 3 times a week, you need help getting dressed why do you need help?
>
>   A. It's my arms and legs just—they hurt so bad that it's hurts to move them or they don't want to work properly, you know, they don't want to do what I want them to do.

In addition to the pain, which the plaintiff attributes to her fibromyalgia, she testified to suffering from fleeting dizziness "off and on throughout the day" which is not brought on by any particular activity but "just happens," which started more than four years earlier and had been getting worse. It appears that this problem would be related to her multiple sclerosis.

---

[2] The plaintiff's medical records contain confirmation that she is very sensitive to and has had adverse side effects from a number of medications.

On August 24, 2007 the ALJ entered his decision finding the plaintiff not disabled. His "Findings of Fact and Conclusions of Law" were:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2007.

2. The claimant has not engaged in substantial gainful activity since August 4, 2003, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).

3. The claimant has the following severe impairments: multiple sclerosis, sleep apnea, obesity, fibromyalgia, panic attacks, and depression (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to lift/carry 10 pounds frequently and 20 pounds occasionally; stand/walk for one hour at a time for a total of four hours in an eight-hour workday; sit for two hours at a time for a total of six hours in an eight-hour workday; can push/pull 20 pounds occasionally and 10 pounds frequently; occasionally bend, stoop, kneel, squat, crouch, crawl, and climb stairs, but is precluded from driving, being around dangerous machinery or heights, being around extreme temperatures and is unable to climb ladders, ropes, or scaffolds. The claimant is further limited to low stress, simple repetitive work with one-two-three step instructions, with limited contact with supervisors, coworkers and the public, and no strict deadlines or production quotas.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on September 3, 1960 and was 42 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

11. The claimant has not been under a disability6, as defined in the Social Security Act, from August 4, 2003 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

The ALJ's decision stands as the defendant's final determination consequent to denial of review by the Appeals council on July 29, 2008.[3]

On this appeal two related arguments are advanced by the plaintiff, those being:

> The ALJ Erred in Rejecting the Opinions of Ms. Kline's Treating Physician, Dr. Mark Wood, and Adopting the Opinion of Non-Examining Physician Dr. Jonathan Nusbaum in Determining Ms. Kline's Residual Functional Capacity.
>
> The ALJ's Determination of Ms. Kline's Credibility Is Not Supported By Substantial Evidence.

This Court believes that there is merit in both.

In this Court's opinion the ALJ crediting the opinion of the medical expert that the plaintiff retains the functional capacity for light work over evidence originating with her primary care physician Dr. Mark Wood, who has been treating the plaintiff since 1991, that she is incapable of

---

[3]The Appeals Council initially denied review on June 6, 2008, but set aside that denial on June 27th to consider additional evidence, and then set aside that action in order to consider more additional evidence in the denial entered July 29th.

working was a clear violation of the "treating physician rule."

As was reiterated in Howard v. Commissioner of Social Security, 276 F.3d 235, 240  6 (6th Cir. 2002), citing to Harris v. Heckler, 756 F.2d 431, 435 (6th Cir. 1985), while it is often said that the opinion of a treating physician on the ultimate issue of disability is not binding, see, Le Master v. Weinberger, 533 F.2d 337 (6th Cir. 1976) that is not always the case.  In King v. Heckler, 742 F.2d 968, 973 (6th Cir. 1984) the court stated the controlling rule to be "Indeed, it has long been the law that substantial deference--and, if the opinion is uncontradicted, complete deference--must be given to such opinions and diagnoses."  See also, Colwell v. Gardner, 386 F.2d 56, 72 (6th Cir. 1967); and Walston v. Gardner, 381 F.2d 580, 585 (6th Cir. 1967).

To be entitled to significant weight the conclusory opinion of a treating physician must be supported by clinical or diagnostic findings.  Kirk v. Secretary of Health and Human Services, 667F.2d 524, 538 (6th Cir. 1981).  However, it is not necessary that such supporting detail be contained in the same document in which the physician's opinion is expressed.  It is sufficient if that opinion is supportable by other medical evidence in the record, including clinical or diagnostic findings of other physicians.  See, Garner v. Heckler, 745 F.2d 383, 391 (6th Cir. 1984).

The rationale behind the treating physician rule was set out by the Sixth Circuit in Walker v. Secretary of Health and Human Services, 986 F.2d 1066 (6th Cir. 1992), as follows:

> The medical opinion of the treating physician is to be given substantial deference and, if that opinion is not contradicted, complete deference must be given.  The reason for such a rule is clear.  The treating physician has had a greater opportunity to examine and observe the patient.  Further, as a result of his duty to cure the patient, the treating physician is generally more familiar with the patient's condition than are other physicians.

Id., at 1070.  While it is true that the ultimate decision of disability is with the ALJ, ibid, if the ALJ

discredits the opinion of a treating physician he/she must articulate a cogent reason for doing so, Wilson v. Commissioner of Social Security, 378 F.3d 541, 545 (6th Cir. 2004).

While the plaintiff's multiple sclerosis had existed for some time before she stopped working, it appears that the diagnosis of fibromyalgia was not made until she was referred by Dr. Wood to a physiatrist, Dr. Christopher Cannell, in September 2003, who found that "she has 14 of 18 tender points using the ACR as criteria for fibromyalgia." The Sixth Circuit long ago recognized that fibromyalgia is a disease that does not necessarily manifest itself through objective testing, but can be disabling, stating in Preston v. Secretary of Health and Human Services, 854 F.2d 815 at 817-818 (6th Cir. 1988):

> ...fibrositis causes severe musculoskeletal pain which is accompanied by stiffness and fatigue due to sleep disturbances. In stark contrast to the unremitting pain of which fibrositis patients complain, physical examinations usually yield normal results—a full range of motion, no joint swelling, as well as normal muscle strength and neurological reactions. There are no objective tests which can conclusively confirm the disease; rather it is a process of diagnosis by exclusion and testing of certain "focal tender points" on the body for acute tenderness which is characteristic in fibrositis patients. The medical literature also indicates that fibrositis patients may also have psychological disorders. The disease common strikes between the ages of 35 and 60 and affects women nine times more than men.

See, also, Rogers v. Commissioner of Social Security, 486 F.3d 234, 243-244, 248 (6th Cir. 2007); Cox v. Barnhart, 345 F.3d 606 (8th Cir. 2003); Brosnahan v. Barnhart, 336 F.3d 2603 (8th Cir. 2003); Green-Younger v. Barnhart, 335 F.3d 99 (2nd Cir. 2003); Sarchet v. Chater, 78 F.3d 305 (7th Cir. 1996); Swain v. Commissioner of Social Security, 297 F.Supp. 986 (N.D. Oh. 2003).

Dr. Wood's patient notes from August 2003 forward refer to fibromyalgia as the plaintiff's primary disorder and contain findings pertinent thereto.

Under date of March 16, 2004 Dr. Wood wrote a "To Whom It May Concern" letter reading:

7

> Chelsea Kline has been a semi tractor trailer driver for 11 years. She has fibromyalgia, multiple sclerosis and dizziness. She has had pain for at least a year. The driving increases her pain. She has tried anti-inflammatory medication for the pain, but they cause extreme drowsiness. After one hour of standing she has pain in her hip, low and upper back and knees. She is very sensitive to medication and has side effects easily.

The record also contains an undated letter which differs from that quoted above by the addition of the concluding sentence "Because of her intense sensitivity to medications and severe pain she is totally disabled from any type of work."

While the ALJ might be entitled to discount the foregoing because of its conclusory nature, the same cannot be said of a "Multiple Impairment Questionnaire" completed by the doctor on April 28, 2006 and a letter report he wrote dated May 18, 2006.

In the questionnaire Dr. Wood stated that he had seen the plaintiff about every two months since 1991, that her diagnoses were multiple sclerosis, fibromyalgia, panic attacks and sleep apnea, and that her prognosis was "poor." In response to the statement "Identify the positive clinical findings that demonstrate and/or support your diagnosis and indicate location where possible" he wrote "Pt. has constant pain in neck, trunk and limb [and] has painful trigger points throughout body. Pt. has chronic fatigue and dizziness related to MS and has ongoing balance issue. Pt. has regular panic attacks and often occurs in public." When asked to list the patient's symptoms Dr. Wood identified "Constant neck and back pain with leg radiculopathy. Pt. unable to sit, stand or walk for prolonged time. Pt. frequently dizzy due to MS and chronically anxious with panic." In several other portions of that form Dr. Wood referenced the plaintiff as suffering from constant pain, and stated that her pain was precipitated by "prolonged sitting in 1 position, any standing or walking worsens pain." He further noted that the plaintiff should not sit or stand/walk continuously in a

8

work setting, and her symptoms would worsen if placed in a competitive work environment. He checked off "No" in response to the questions whether the plaintiff could perform a full time job that requires activity on a sustained basis, and whether the plaintiff is a malingerer. In response to the question "Will your patient sometimes need to take unscheduled breaks to rest at unpredictable intervals during an 8-hour workday?" Dr. Wood answered that this would happen "up to every 1/2 to 1 hour" and that such a break would last "15 to 20 minutes."[4] He also stated that the plaintiff would be likely to be absent from work more than three times a month.[5] In conclusion, Dr. Wood stated that the plaintiff's symptoms and limitations began in August of 2003 and that "Since 8-03 fibromyalgia symptoms have significantly worsened."

In his narrative letter report written not quite two months later Dr. Wood set out the plaintiff's medical history since she was diagnosed as suffering from fibromyalgia,[6] and in

---

[4] The vocational expert testified that an individual with such a need would not be employable.

[5] Again, the vocational expert testified that an individual who would miss that much work would not be employable.

[6] Included in that history Dr. Wood stated:

"In 2003 the patient was having increasing anxiety and frequent panic attacks which were adversely affecting her work. Patient is currently on Zoloft and has less frequent panic attacks, but has continued ongoing anxiety. With her inability to work she is frequently anxious out in public because she is afraid that people feel she is not employable and this has limited her social behavior. She does continue to have ongoing panic attacks with her chronic anxiety. Because of her decreasing activity, because of not working and not wanting to be out in public routinely, she has become more deconditioned with worsening of her fibromyalgia. The patient currently has chronic pain in her neck, trunk and extremities. Exercise or lifting, bending, twisting and prolonged sitting all worsen the pain and changes from a constant muscle ache and spasm to a sharp pain. Patient is seen every 2 to 3 months unless there is an exacerbation of her symptoms. With the patient having very limited activity and no ongoing work, her panic and symptoms of MS have not severely progressed. Unfortunately, as noted above, her pain with fibromyalgia has worsened because of lack of exercise and activity with all medications leading to unwanted side effects, which usually cause GI distress or worsening of her dizziness and balance problems. Patient readily admits that she has anxiety that leads to panic if she has the responsibility of performing complex task for self or others. Patient appears to be having progressive depression because her inability to have a satisfactory and functional status. In her exams she has demonstrated ongoing anxiety, balance issues secondary to dizziness, and painful muscular/skeletal trigger points throughout the body secondary to her fibromyalgia."

9

conclusion stated:

> Due to her fibromyalgia and worsening pain, she is unable to sit, stand or walk for significant periods of time and would require a break every hour and would lose several days of work per month because of her condition. I feel that her anxiety and panic would worsen if she were placed in a position that demanded ongoing concentration and she would have a fear of failure and making mistakes which would prohibit her from functioning adequately. I feel that her diagnoses of fibromyalgia, multiple sclerosis, and anxiety with panic are all progressive conditions that will gradually worsen and lead to worsening functional capacity. I feel that these symptoms have been present for years and will continue to be present long tern greater than 12 months and she will not have the ability to adequately function at all in the future to obtain any substantial ongoing employment.

At the de novo hearing Dr. Nusbaum recognized that the plaintiff suffers from fibromyalgia and multiple sclerosis, but opined that with those impairments she should be capable of performing light work activities, with some limitations. When the subject of Dr. Wood's assessment of the plaintiff was raised Dr. Nusbaum's response was "That's his opinion, my opinion is that she can work under the limitations I stated." He also testified:

> A. I would suggest that her treating physician does not have her on any pain medication presently.
>
> Q. Well, didn't she—didn't the doctor also say that he actually said this in the medical notes in the record, didn't he say that she's very sensitive to pain medications? And the claimant testified to resting during the day. Isn't that a way that someone can deal with pain?
>
> A. That can also be a life-style choice.[7]

Not only is the ALJ's acceptance of Dr. Nusbaum's opinion over that of Dr. Wood a patent violation of the treating physician rule, his reasons for doing so cannot withstand scrutiny.

---

[7]This Court is unaware that sensitivity to pain medications can be a life-style choice.

One of the factors cited by the ALJ was a report from a treating neurologist, Dr. Geoffrey Eubank, which indicated that the plaintiff was only suffering from "a mild degree of disability that makes it difficult for her to work." The problem with this is that his report was written on November 5, 2002, ten months before the plaintiff's claimed onset date, and only took into account her multiple sclerosis, the fibromyalgia being diagnosed eleven months later.

Equally insubstantial is the fact that the ALJ noted that in completing the Multiple Impairment Questionnaire "Dr. Wood reported that the claimant's pain on a scale of '0' to '10' with '10' being the most severe pain was '0-1' which is inconsistent with the limitations assessed by Dr. Wood." It is correct that Dr. Wood circled "0-1" on the form, but this Court agrees with plaintiff's argument that this is so inconsistent with the doctor's repeated specific references in the questionnaire to the plaintiff suffering from severe chronic pain that must be reflective of an inadvertence on the doctor's part, other than his view that the plaintiff hardly suffers from pain, the interpretation placed upon it by the ALJ.

The ALJ also appears to have discounted Dr. Wood's opinion because "This doctor apparently relied quite heavily on the subjective report of symptoms and limitations provided by the claimant and seemed to accept as true most, if not all, of what the claimant reported." Is that now how any competent physician pursues a course of treatment—by accepting at face value what his/her patient is relating in order to obtain treatment, until or unless the doctor has a reason to doubt the reliability of the patient's complaints?

That statement by the ALJ was followed by "Yet, as explained elsewhere in this decision, good reasons existing for questioning the reliability of the claimant's subjective complaints," which implicates plaintiff's second claim of error. Let us now examine those "good reasons."

11

As the ALJ did not specify where those "good reasons" could be found this Court has combed his decision, and assumes that they are reflected in the following excerpts:

> She testified that she is able to take care of her personal needs although at times she needed assistance with dressing. She does stretches for five to ten minutes, three times a week. She further testified that she drives, grocery shops once a week, and dines out once a week. She does some gardening and plays solitaire once a month. As to her daily activities, she testified that she cooks, washes dishes, does laundry and takes care of her cat.
>
> \* \* \*
>
> The claimant testified that on a scale of "0" to "10," with "10" being the most severe pain, the claimant rated the level of her pain on a typical day as a "4" and her worst pain as a "7 to 8." However, the claimant's treating physician reported that the claimant's pain was a "0-1." The claimant continues to be able to do exercise stretches three times a week for five to ten minutes and reported that physical therapy helped reduce her pain. The claimant does not take any pain medication other than Tylenol. With respect to the claimant's dizziness, the claimant reported that she uses a cane two to three times a week because her equilibrium is off; however, no physician has prescribed the use of a cane. Dr. Eubank reported that the claimant's neurological exam was essentially normal. He further reported that although the claimant had multiple sclerosis her problems did not cause any severe disability.
>
> \* \* \*
>
> In addition to the general lack of objective medical evidence to support the extent of the claimant's subjective complaints, there are other considerations that detract from the claimant's overall credibility.
>
> As delineated above, the claimant was able to engage in a wide variety of activities. The ability to engage in these activities is not indicative of someone with pain and other symptoms so severe that all work activity would be precluded. In fact, Dr. Nusbaum opined that the claimant's statements regarding her restriction on her activities was a "lifestyle choice" based on the medical evidence of record.

This Court finds each of the above to be insubstantial.

On the subject of her personal activities the plaintiff testified:

> Q. Okay. Do you do your own grooming when you get up?
>
> A. Yes.
>
> Q. Do you need assistance in either area?
>
> A. Sometimes.
>
> Q. In what area?
>
> A. Dressing.
>
> Q. Okay, in what part of dressing?
>
> A. Like putting my pants on or my shirt on.
>
> Q. Okay and how often do you need this assistance?
>
> A. Maybe 2, 3 times a week.
>
> Q. Okay. That's fine. Do you cook?
>
> A. Yes.
>
> Q. You cook, oh, okay. Do you wash dishes?
>
> A. Sometimes.
>
> Q. How often is sometimes to you?
>
> A. Dishes, I'll, I'll do maybe once or twice a week, you know because, you know, you have—
>
> Q. That's fine.
>
> A. —only standing for like 5 minutes or something like that, you know.
>
> Q. Okay. Do laundry?

A. Sometimes, yes.

Q. How often is sometimes?

A. Maybe a load a week.

Q. Okay. Vacuum, dust, that kind of stuff?

A. No.

Q. Who does that for you?

A. My roommate.

Q. Okay and why can't you do that?

A. Because it like irritates, irritates my arms and legs.

Q. Okay. Do you do any special exercises at all?

A. Yes.

Q. Okay.

A. The—

Q. What are these?

A. —like stretching.

Q. Stretching?

A. yeah.

Q. Okay. Do you do that on a daily basis?

A. No.

Q. How often do you do it?

A. Oh, maybe a couple—well, maybe 3 times a week.

Q. Okay, how long do you do it for?

14

A. Five, ten minutes.

Q. Okay. Do you do any gardening?

A. Occasionally I'll go outside and set and maybe pull a weed or 2 but that's about it.

Q. Okay. That's fine. Do you go to church?

A. No.

Q. If that just a personal choice on your part?

A. Yeah.

Q. Do you go grocery shopping?

A. yes.

Q. How often?

A. Maybe once a week.

Q. Do you go to movies?

A. No.

Q. Eat out at all?

A. Yes.

Q. How often?

A. Maybe once a week.

Q. Okay. You've got animals?

A. Yes. I have a cat.

Q. Okay, okay. So, do you feed it, give it water, clean its litter box?

A. Feed it, give it water, pet it.

Q. Okay, how about the litter? How about the (INAUDIBLE)?

15

  A. No, I don't do that because it, you know.

  Q. Who does, who does that for you?

  A. My roommate.

  Q. Your roommate?

  A. Yes.

  Q. When you filled out a, a questionnaire dated October 21st, 2006 at that time you said you did take care of the litter box.

  A. Yeah.

  Q. Why quit—why can't you do that now?

  A. I guess because the bending over.  Yeah, it's the bending over.

  Q. That's fine.  So what do you, like what do you do for the rest of the day?  You watch television or what?

  A. Yeah, I'll lay and set and watch TV.

  Q. Okay, it says you play cards.  Do you still play cards?

  A. Sometimes, yeah.  Maybe—

  Q. What, what, what kind, what kind of cards (INAUDIBLE).

  A. Oh, maybe once a month or something.

  Q. No, what are we talking about?  Poker (INAUDIBLE)?

  A. Solitaire.

  Q. Oh—

  A. Solitaire.

  In this Court's opinion this testimony hardly supports the ALJ's implication that the plaintiff leads an active life, inconsistent with her claim of disability.

The subject of Dr. Wood circling the "0-1" rating in the questionnaire has already been covered, and will not be repeated.  The same is true of the plaintiff's use of Tylenol, by reason of her sensitivity to other pain medications which were prescribed, and of the fact that Dr. Eubank's report predates both the plaintiff's onset date and the diagnosis of fibromyalgia.

The "lack of objective medical evidence" is, as recognized by the Sixth Circuit Court of Appeals, a hallmark of fibromyalgia, a disease that the ALJ accepted as one from which plaintiff suffers.

This Court has already commented on Dr. Nusbaum's (snide) "lifestyle choice" comment, and has nothing further to say on that subject.

In summary, this Court concludes that the ALJ failed to articulate a single good reason for discounting the plaintiff's credibility and/or rejecting Dr. Wood's determination that the plaintiff is incapable of engaging in any work activities.

It follows that as the ALJ was bound to give full credence to the evidence originating from Dr. Wood the defendant's final determination should be reversed and final judgment entered in the plaintiff's favor finding that she is entitled to an award of disability insurance benefits under her application filed November 28, 2003 and an award of supplemental security income under her application filed October 18, 2004 for such period thereafter as she satisfies the economic criteria for eligibility for such benefits.  It is recommended that such judgment be entered.

                                                  s/DAVID S. PERELMAN
                                                  United States Magistrate Judge

DATE:    September 16, 2009

**OBJECTIONS**

Any objections to this Report and Recommended Decision must be filed with the Clerk of Courts within ten (10) days of receipt of this notice. Failure to file objections within the specified time waives the right to appeal the District Court's order. *See, United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See, also, Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).